IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

KATHLEEN S. CLARKE,

                    Plaintiff,

v.                                                   CIVIL ACTION NO.   2:21-cv-00546

TANGO NETWORKS, INC., et al.,

                    Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants Tango Networks, Inc. ("Tango"); Nextep Business Solutions, Inc. ("Nextep"); TriNet HR III-A, Inc. ("TriNet") (collectively, the "Defendants"); and Michael Bishop's ("Bishop") motions to dismiss.  (ECF Nos. 6, 9, 13.)  For the reasons that follow, the Court finds that it lacks personal jurisdiction over these Defendants, and therefore **GRANTS** the motions.

*I.    BACKGROUND*

This action arises out of the alleged constructive discharge of Plaintiff Kathleen Clarke's ("Plaintiff") employment.  The following allegations are drawn from Plaintiff's Complaint.  (ECF No. 1–1.)  Plaintiff is a resident of Kanawha County, West Virginia.  (*Id.* at ¶ 2.)  Defendant Tango is a Delaware corporation with a principal place of business in Frisco, Texas.  (*Id.* at ¶ 3.)  Defendant Nextep is a Texas corporation with its principal place of business in Norman, Oklahoma.  (*Id.* at ¶ 4.)  Plaintiff alleges that Tango and Nextep formed a "contractual, co-employment relationship," where Nextep administered payroll, employee benefits, and human

resources and risk management services to Plaintiff.  (*Id.* at ¶ 5.)  Plaintiff further alleges that

Tango's and Nextep's relationship was set forth in their employee handbook, which explained that

the entities were defined as Plaintiff's "employers [with] certain rights and responsibilities with

respect to [Plaintiff's] employment."  (*Id.* at ¶ 5, n.1.)  According to Plaintiff, Tango and Nextep

"shared, agreed to allocate responsibility for, and/or co-determined the essential terms and

conditions of [her] employment."  (*Id.* at ¶ 5.)  Defendant TriNet is a Delaware corporation with

its principal place of business in Dublin, California.  (*Id.* at ¶ 6.)  Plaintiff alleges that Tango and

TriNet "partnered" to form a "co-employment relationship," in which Tango and TriNet "shared,

agreed to allocate responsibility for, and/or co-determined the essential terms of and conditions of

Plaintiff's employment," and as such, were joint-employers of Plaintiff.  (*Id.* at ¶ 7.)  Defendant

Bishop is a resident of Texas and, at all times relevant to this action, was "jointly employed" by

Tango and Nextep or TriNet.  (*Id.* at ¶ 9.)

Plaintiff alleges that she was employed by Defendants as a "Sales Director"[1] from

approximately May 13, 2019, until on or around December 4, 2020.  (*Id.* at ¶ 11.)  Plaintiff

further asserts, upon information and belief, that Tango and Nextep terminated its "contractual,

co-employment relationship" sometime in December 2019, and that Tango and TriNet

subsequently began a "contractual, co-employment" relationship in early 2020.  (*Id.* at ¶ 11, n.3.)

Thus, Plaintiff alleges that she was jointly employed by both Tango and Nextep, and Tango and

TriNet, over the course of her employment.  (*Id.*)  In her position, Plaintiff's responsibilities

included "implementing strategy and marketing plans to recruit technology partners" for

Defendants.  (*Id.* at ¶ 14.)  Her job duties required her to "frequently" travel to business events,

---

[1] Tango asserts that Plaintiff's actual job title was "Channel Account Director – Eastern United States."  (ECF No. 7 at 5, n.2.)

both nationally and internationally, recruit new partners, and maintain and procure business relationships. (*Id.*)

During her employment, Plaintiff reported to Pamela Strong, the Vice President of Global Channel Sales, who oversaw a team including Plaintiff; Michael Wheelock, Director of Sales, Sales Engineering, and Sales Operations; and Bishop, Director of Sales Engineering. (*Id.* at ¶ 15.) In late May 2019, Plaintiff accompanied Ms. Strong, Mr. Wheelock, and Bishop to Orlando, Florida, "to attend business meetings." (*Id.* at ¶ 16.) While there, Mr. Wheelock and Bishop apparently learned of Plaintiff's then-recent divorce, which Plaintiff confirmed to them. (*Id.*) Plaintiff confided in them that the divorce had been "horrific" and involved "extreme domestic violence." (*Id.*)

Approximately three months later, Plaintiff again travelled for a "two-part work trip." (*Id.* at ¶ 17.) First, Plaintiff travelled to Bedford, New Hampshire, where she attended meetings with Ms. Strong and Bishop. (*Id.*) The second leg of the trip involved her travelling to Chicago, Illinois, with Mr. Wheelock and Bishop. (*Id.*) Plaintiff and Bishop flew directly from the Manchester-Boston Regional Airport in New Hampshire to Chicago, where they were scheduled for an early afternoon business meeting on or around July 31, 2019. (*Id.* at ¶¶ 17–18.) While Bishop had reservations in a different hotel, the two travelled to Plaintiff's hotel and unloaded their luggage into Plaintiff's room, and then left immediately for the meeting. (*Id.* at ¶ 18.)

After the meeting, Plaintiff and Bishop returned to Plaintiff's hotel, where they continued to work from the hotel lobby. (*Id.* at ¶ 19.) Upon finishing, Bishop followed Plaintiff up to her hotel room to retrieve his luggage. (*Id.*) Once the two were alone on the elevator, Plaintiff alleges that Bishop said to her, "[y]ou're going to be mad, but I have to do this." (*Id.*) Bishop

then "lunged" at Plaintiff and groped her breast.   (*Id.*)   Plaintiff alleges that Bishop said, "I have a thing for boobs.   They are my weakness.   And yours are perfect."   (*Id.*)

Plaintiff reported Bishop's behavior to her supervisor, Ms. Strong, who instructed Plaintiff to "document the incident in writing" and report it to "Defendants' Human Resources [] department."   (*Id.* at ¶ 20.)   Plaintiff reported the incident to the human resources department on August 5, 2019, via email.   (*Id.*)

The following day, August 6, Tara Hurley, Vice President of Finance and Controller, replied to Plaintiff's email and requested that Plaintiff contact her for an update regarding the incident she had reported.   (*Id.* at ¶ 21.)   Plaintiff contacted Ms. Hurley, who told Plaintiff that herself; the President and CEO of Tango, Mr. Bartek; Ms. Strong; and Bishop had met "internally" and that the decision was made to retain Bishop.   (*Id.*)   At that time, Ms. Hurley offered to provide Plaintiff with counseling.   (*Id.*)

On August 8, Plaintiff emailed Ms. Hurley to accept the offer of counseling and further asked what options were available to her.   (*Id.* at ¶ 22.)   Ms. Hurley failed to respond until Plaintiff sent a second email on August 19.   (*Id.*)   Also on August 8, Plaintiff exchanged emails with Mr. Bartek, who told her that the "right thing[s] [would] be done as a result of the action" and that he would be "making the punishment, corrections, and resolution a top priority."   (*Id.* at ¶ 23.)   Mr. Bartek further assured Plaintiff that she would "never have to worry about retaliation." (*Id.*)

Plaintiff next alleges that on August 12, "Defendants [Tango, Nextep, and TriNet]" directed her to attend a "telephone call" on which Mr. Bartek, Ms. Hurley, Ms. Strong, and Bishop participated.   (*Id.* at ¶ 24.)   Plaintiff stated that she felt even more distress from having to be on

4

the call with Bishop, during which the group discussed Bishop's "sexually offensive conduct." (*Id.*)  Despite assurances, Plaintiff alleges that "no safety plan was communicated" to her to prevent further harassment or hostility.  (*Id.*)  Finally, Plaintiff alleges that Bishop "made an admission against [his] interest by apologizing for his actions," but that she did not believe Bishop's apology to be genuine.  (*Id.*)

Despite reporting this incident, Plaintiff alleges that Defendants continued to schedule her for work trips and that Bishop was also required to attend the same events.  (*Id.* at ¶ 25.)  These included traveling to Montreal, Canada, from August 13, 2019 to August 15, 2019.  (*Id.* at ¶ 25(a).)  During this trip, Plaintiff "attempted to stay with Ms. Strong at all times," but Bishop "still found Plaintiff, alone, on an elevator," which caused her distress.  (*Id.*)  The next trip came from September 23, 2019, through September 27, 2019, when she was required to travel with Bishop to Dallas, Texas, and was "forced again to attend business meetings and dinner events" with Bishop.  (*Id.* at ¶ 25(b).)  Shortly following this trip, Plaintiff was again required to travel with Bishop and Ms. Strong, this time to Toronto, Canada, from October 1, 2019, through October 6, 2019.  (*Id.* at ¶ 25(c).)  During this trip, Plaintiff alleges that "Bishop waited until Plaintiff was alone to approach her," and when he did, he "cruelly told Plaintiff that he wanted to thank her for reporting him," as he and his wife "had been having problems," and that Plaintiff's reporting of his behavior "was helping his marriage situation."  (*Id.*)  Bishop also allegedly said that he admitted his behavior to Mr. Bartek, and that Mr. Bartek told Bishop that he would not be terminated, which Plaintiff interpreted as Bishop "taunting and intimidating her" for reporting his behavior.  (*Id.*)  Finally, in or around February 2020, Plaintiff was required to again travel to Texas for a "sales meeting kickoff."  (*Id.* at ¶ 25(d).)  There, she alleges that Bishop "invaded

5

her personal space and selectively chose to sit directly beside" her.  (*Id.*)  Then, as a team-building exercise, Plaintiff alleges that a golfing event was scheduled, but that she had no other option than to join Bishop's team, which she refused.  (*Id.*)  As a result of her refusal, Plaintiff alleges that she "felt shunned" by her colleagues.  (*Id.*)

Following her interaction with Bishop in Toronto, Plaintiff again called Mr. Bartek to report to him Bishop's behavior.  (*Id.* at ¶ 26.)  According to Plaintiff, Mr. Bartek "rushed Plaintiff off the phone" and did not take any further action regarding Bishop's hostility.  (*Id.*)  Despite telling her that he would check on her periodically, Mr. Bartek never did.  (*Id.*)  Following this call with Mr. Bartek, Plaintiff alleges that she "noticed changes in the attitudes of her colleagues," and specifically with Ms. Hurley.  (*Id.* at ¶ 27.)  Shortly following her call with Mr. Bartek, on or around October 10, 2019, Plaintiff alleges that she spoke with Ms. Hurley, who "chastised" Plaintiff for calling Mr. Bartek instead of her.  (*Id.*)

At the conclusion of the 2020 Texas trip, the outbreak of the COVID-19 pandemic halted Plaintiff's work trips.  (*Id.* at ¶ 28.)  However, Plaintiff alleges that this did not stop her from having to encounter Bishop, as Defendants required her to attend weekly video calls along with Bishop.  (*Id.*)  Plaintiff reported to her supervisors that continuing to have to see and interact with Bishop caused her distress.  (*Id.*)  In July 2020, Plaintiff continued to report her distress to her supervisors, but no action was taken by Defendants regarding these weekly meetings.  (*Id.* at ¶ 29.)

Around that same time, Plaintiff was due for compensation and performance reviews.  (*Id.* at ¶ 30.)  However, Plaintiff's former supervisor, Ms. Strong, had her employment terminated by Defendants in August 2020, so Plaintiff instead reached out to Mr. Hekseth, her interim supervisor,

to schedule her review.   (*Id.* at ¶ 30.)   Mr. Hekseth responded by allegedly telling Plaintiff that he "did not think it was a good idea to approach Mr. Bartek about Plaintiff's compensation."   (*Id.*)   Her evaluation was apparently never conducted.   (*Id.*)

Then, in November 2020, Plaintiff discovered that Defendants had excluded her from a "business meeting" that she normally would have attended.   (*Id.* at ¶ 31.)   In particular, Plaintiff learned that two of the companies she had signed to work with and managed for Defendants, Atlantech Online and JS Foods, had a business opportunity together.   (*Id.*)   Instead of including Plaintiff, Mr. Bartek allegedly excluded her in favor of Bishop, despite those companies being signed and managed by Plaintiff.   (*Id.*)

Plaintiff alleges that Defendants' failure to "alleviate the sexual harassment" by Bishop, her exclusion from the November 2020 meeting, refusal to conduct her performance evaluation, and her required attendance on various trips and video calls with Bishop were all in retaliation for her reporting of Bishop's sexual harassment.   (*Id.* at ¶ 32.)   As a result, Plaintiff alleges that she was "forced to constructively discharge herself from the workplace."   (*Id.* at ¶ 33.)

Plaintiff filed her complaint in the Circuit Court of Kanawha County, West Virginia, on July 22, 2021.   (*Id.* at 2.)   Plaintiff asserts four causes of action: (1) Battery, asserted against Bishop; (2) Common Law Wrongful Discharge, asserted against Defendants Tango, Nextep, and TriNet; (3) Reprisal, asserted against Defendants Tango, Nextep, and TriNet; and (4) Constructive Discharge, asserted against Defendants Tango, Nextep, and TriNet.   (*Id.* at 13–16.)   Defendants Bishop and Tango removed the complaint to this Court on September 30, 2021.   (ECF No. 1.)

On October 6, 2021, Defendants Bishop and Tango filed their Motion to Dismiss.   (ECF No. 6.)   Plaintiff timely responded on October 20.   (ECF No. 8.)   Defendants Bishop and Tango

timely submitted their reply on October 26.   (ECF No. 11.)   On October 13, Defendants Nextep and TriNet filed their own motions to dismiss.   (ECF Nos. 9, 13.)   Plaintiff timely responded to each.   (ECF No. 19, 20.)   Nextep and TriNet each timely replied.   (ECF Nos. 22, 23.)   With the briefing on each motion complete, they are now ripe for adjudication.

## II.   *LEGAL STANDARD*

Under Federal Rule of Civil Procedure 12(b)(2), a court may dismiss claims for lack of personal jurisdiction.   Fed. R. Civ. P. 12(b)(2).   "When a non-resident defendant files a motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure challenging the court's power to exercise personal jurisdiction, 'the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence.'"   *Felman Prod. v. Bannai*, 517 F.Supp.2d 824, 827–28 (S.D. W. Va. 2007) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).   However, "[w]here, as here, the district court addresses the question of personal jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the complaint, the plaintiff bears the burden of making a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."   *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).   In considering the documents submitted, "the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."   *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (citation and quotation marks omitted).   The Court need not, however, "credit conclusory allegations or draw farfetched inferences."   *Masselli & Lane, PC v.*

*Miller & Schuh, PA,* No. 99–2440, 2000 WL 691100, at *1 (4th Cir. May 30, 2000) (unpublished) (quoting *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir. 1994)).

## III.   DISCUSSION

Each defendant in this action has filed a motion to dismiss pursuant to Rule 12(b)(2), arguing that the Court lacks personal jurisdiction.   Therefore, the Court shall first set forth the applicable law of personal jurisdiction before examining how those principles apply to each of the defendants in this case.

### A.  Personal Jurisdiction

"A federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment[.]" *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).   The parties are in agreement that West Virginia's long-arm statute, W. Va. Code § 56-3-33, extends to the constitutional maximum permitted by the Due Process Clause of the Fourteenth Amendment.   *See also Touchstone Research Lab., Ltd. v. Anchor Equip. Sales, Inc.*, 294 F.Supp.2d 823, 827 (N.D. W. Va. 2003).   Because West Virginia's long-arm statute extends personal jurisdiction to the constitutional maximum, "the statutory inquiry merges with the constitutional inquiry." *Consulting Eng'rs Corp.*, 561 F.3d at 277.   Thus, the remaining question is whether the exercise of personal jurisdiction would comport with due process.

To satisfy the constitutional inquiry, two elements must be met: First, a defendant must have sufficient "minimum contacts" with the forum state, and second, that such minimum contacts requiring a defendant to defend their interests in the state does "not offend traditional notions of

9

fair play and substantial justice." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those activities." *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . ., or of the 'unilateral activity of another party or a third person[.]'" *Burger King Corp.*, 471 U.S. at 475 (internal citations omitted). Recognizing that the "unilateral activity" of one who claims a relationship with a nonresident defendant is generally insufficient to establish personal jurisdiction, the Supreme Court instructs that jurisdiction is proper where "the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* at 474–75 (emphasis in original). Purposeful availment is the "constitutional touchstone" of personal jurisdiction. *Id.* at 475.

"The due process inquiry 'can be undertaken through two different approaches – by finding specific jurisdiction based on conduct connected to the suit or by finding general jurisdiction' based on 'continuous and systematic' activities." *Fields v. Sickle Cell Disease Association of America, Inc.*, 376 F.Supp.3d 647, 651 (4th Cir. 2018) (quoting *ALS Scan, Inc. v. Digital Serv. Consul., Inc.*, 293 F.3d 707, 711 (4th Cir. 2002)). General jurisdiction is available only if a defendant's contacts with a state "are so continuous and systematic as to render it essentially at home in the forum state." *Daimler AG v. Bauman*, 134 S.Ct. 746, 761 (2014) (citing *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).   "If the defendant does not have sufficient contacts to be at home in the forum, the court may exercise specific jurisdiction if the defendant has systematic contacts with the forum state and the claims at issue arise from those contacts with the forum state."   *Fidrych v. Marriott Inter., Inc.*, 952 F.3d 124, 132 (4th Cir. 2020). "[T]he paradigm forums where corporations are fairly regarded as at home are the forums where it is incorporated and where is has its principal place of business."   *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).

Specific jurisdiction is available where "the defendant's qualifying contacts with the forum state also constitute the basis for the suit."   *Universal Leather, LLC.*, 773 F.3d at 559.   The United States Court of Appeals for the Fourth Circuit has established a three-part test to determine whether specific personal jurisdiction is appropriate: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arose out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable."   *Id.*   A plaintiff must prevail on each prong.   *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016).   "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."   *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quotations omitted).

## B.  Michael Bishop

The Court first turns to Bishop's argument that Plaintiff has failed to allege or establish that Bishop has the requisite minimum contacts with the State of West Virginia, such that this Court would possess personal jurisdiction.   (ECF No. 7 at 4.)   In support of this argument, Bishop

11

argues that he his domiciled in and a resident of Texas; has never visited West Virginia; owns no property or assets in West Virginia; and has no "business interests" in West Virginia.  (*Id.* at 4–5.)  Furthermore, Bishop argues that the alleged incident that forms the basis of Plaintiff's claims occurred at a hotel in Chicago, Illinois, and that any further alleged encounters occurred in other states.  (*Id.* at 5.)  Therefore, Bishop maintains that the Court lacks personal jurisdiction over him, and he should be dismissed from this lawsuit.  (*Id.*)

Plaintiff, in her response, concedes these points, stating that she "is not contesting the dismissal of the battery claim against Defendant Michael Bishop."  (ECF No. 8 at 1, n.1.)  Therefore, the Court **GRANTS** Bishop's motion and **DISMISSES** the battery claim and Defendant Bishop for a lack of personal jurisdiction.

C.  *Tango Networks, Inc.*

Tango similarly argues that Plaintiff has failed to allege and cannot establish that Tango has the requisite minimum contacts with the State of West Virginia for this Court to exercise personal jurisdiction.  (ECF No. 7 at 5.)  Tango argues that it is an entity incorporated in the State of Delaware with a principal place of business in Frisco, Texas.  (*Id.*)  Tango also asserts that while Plaintiff alleges that she primarily performed work in Kanawha County, West Virginia, she was "[i]n reality," a remote employee whose physical presence in West Virginia was "entirely incidental" and not germane to the performance of her duties.  (*Id.* at 5–6.)  Thus, because Tango does not maintain any offices, own or rent property, and only employs one remote worker in West Virginia, Tango argues that Plaintiff cannot satisfy the minimum contacts requirement for this Court to exercise personal jurisdiction, either general or specific.  (*Id.* at 8.)

12

In response, Plaintiff argues that Tango has purposefully availed itself of the privileges of doing business in West Virginia.  (ECF No. 8 at 14.)  Plaintiff asserts that Tango "recruited" Plaintiff, knowing that she resided in West Virginia and intended to continue residing and working from there.  (*Id.*)  She also argues that she performed the majority of her work from West Virginia, likening her situation to that in *Williams v. Preeminent Protective Servs.*, 81 F.Supp.3d 265 (E.D.N.Y. 2015), where the court found personal jurisdiction over a non-resident employer. (*Id.* at 14–15.)  Furthermore, Plaintiff asserts that Tango provided her with the necessary implements for her to perform her duties remotely, including a laptop computer and a "communication allowance" to cover her internet and phone bills.  (*Id.* at 15.)  Relatedly, Plaintiff argues that, in addition to completing her work from West Virginia, she also communicated with Tango from West Virginia regarding the facts and issues "at the heart of her claims," along with her resignation email, which she argues is the actual event from which her claim of constructive discharge arises.  (*Id.*)  Finally, with the rise of COVID-19, Plaintiff argues that Tango availed itself to the laws of West Virginia by requiring her to attend weekly video conferences with the knowledge that she would be attending virtually from West Virginia.  (*Id.* at 17.)

In support of its argument against finding personal jurisdiction, Tango cites to *Callahan v. Wisdom*, No. 3:19-CV-00350 (KAD), 2020 WL 2061882 (D. Conn. April 29, 2020).  In *Callahan*, the District Court of Connecticut found that the defendant, an Illinois corporation with its principal place of business in Illinois, did not purposefully avail itself in the State of Connecticut where it engaged the plaintiff as a consultant, as the plaintiff's location in Connecticut was "purely incidental" to the work of the corporation.  *Id.* at *12.  The non-resident corporation contacted

the plaintiff and engaged him to perform customer development work for the company.   *Id.* at *10.   The majority of the plaintiff's duties were conducted from Connecticut, where he resided, and he exchanged numerous telephone calls and emails with the defendant corporation relating to his duties.   *Id.* at *10.   Considering these facts, the court stated that the plaintiff "established a factually supported case of personal jurisdiction" over the non-resident corporation, but declined to find specific jurisdiction because the plaintiff failed to establish that the exercise of personal jurisdiction comported with due process.   *Id.* at *11–*12.

In making this finding, the district court relied on the Supreme Court's instruction in *Walden v. Fiore*, 571 U.S. 277 (2014), regarding minimum contacts.   The district court recognized that the inquiry focused on two related aspects: First, that "the relationship must arise out of contacts that the 'defendant *himself*' creates," and second, that the analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."   *Callahan*, 2020 WL 2061882 at *11 (quoting *Walden*, 571 U.S. at 284–85) (emphasis in original).   Considering this, the court reasoned that the non-resident defendant only communicated with the plaintiff, even while recognizing that the defendant had other Connecticut-based customers.   *Id.* at *12.   However, these other customers had no relation to the suit and therefore could not factor into the analysis of *specific* jurisdiction, and the court further cautioned that "the plaintiff cannot be the only link between the defendant and the forum."   *Id.* at *11–*12 (quoting *Walden*, 571 U.S. at 285).   Therefore, the court found that the corporation's contacts with Connecticut "began and ended with [plaintiff], which cannot be the basis upon which due process is satisfied."   *Id.* at *12.

14

Conversely, Plaintiff relies on *Williams v. Preeminent Protective Servs., Inc.*, a decision she asserts is "perfectly analogous" to the facts here, to argue that exercising personal jurisdiction is appropriate.  (ECF No. 8 at 9.)   In *Williams*, the plaintiff, a Brooklyn, New York resident, was approached by the Maryland defendant corporation to work for it as a marketing assistance provider.   *Williams*, 81 F.Supp.3d at 268.   The plaintiff handled all the defendant's communications and marketing needs, was expected to be available "at all times," and was given a laptop, cellphone, and internet hotspot for that purpose.  *Id.* at 268–69.   Her duties included "coordinating communications between [defendant's] central office and hundreds of its field employees via a text-messaging system she implemented and operated from her home."  *Id.* at 269.   Ultimately, the plaintiff was discharged from her employment and the defendant allegedly failed to compensate her for various commissions she earned, leading to the lawsuit.  *Id.*

The District Court for the Eastern District of New York immediately declined to find general jurisdiction, as it would "clearly violate [] due process principles," and turned its analysis to specific jurisdiction.  *Id.* at 270.   Citing New York's long-arm statute, the district court reasoned that the defendant's hiring of plaintiff despite knowing she would live and work in Brooklyn, sending her the materials she needed to perform her duties, and expecting her to be on call at all hours were sufficient to conclude that the defendant had "transacted business" in the State of New York.  *Id.* at 271.   Relying on this same reasoning, the court also found that the defendant "availed" itself of the forum, notwithstanding that it had not sought a "unique benefit."  *Id.* at 272.   Thus, the court found it could exercise personal jurisdiction as the defendant's actions were "the kind of independent activities in the [forum] state that render long-arm jurisdiction

appropriate."  *Id.* at 271 (citing *Fischbarg v. Doucet,* 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501, 880 N.E.2d 22 (2007)).

In this case, the Court is of the opinion that the contacts alleged by Plaintiff are too attenuated to satisfy the minimum contacts test, thereby depriving this Court of personal jurisdiction.   First, and as evidenced, Tango's contacts with the State of West Virginia are not so continuous or systematic to render it essentially at home.   Tango has no business in or with West Virginia, neither owns nor leases property in the state, and only employed Plaintiff in West Virginia.   (*See* ECF No. 7–2 at ¶¶ 3–6.)   As numerous courts have found, such insignificant contacts with the forum, without more, is insufficient to establish general jurisdiction.   *See Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1198, 1200 (4th Cir. 1993) (denying general jurisdiction over defendant who had 17 to 21 employees in the state); *Ingeniador, LLC v. Interwoven*, 874 F. Supp. 2d 56, 62 (D.P.R. 2012) (holding that, without more "continuous and systematic" ties to the forum, one employee in the forum state is insufficient to grant general jurisdiction); *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 75–76 (D.D.C. 2004) (holding that an office staffed by one employee is insufficient to confer general jurisdiction).

As to specific jurisdiction, Plaintiff's residence in West Virginia is merely incidental to her work for Tango.   While the Court is hesitant to say Plaintiff's choice to reside here was solely a "unilateral decision," as Tango still chose to accommodate her choice, it is readily apparent that her physical location had little to no bearing on her responsibilities.   Mere accommodation of an employee's choice to work remotely cannot alone form the basis of asserting specific jurisdiction. *Fields v. Sickle Cell Disease Association of America, Inc.*, 376 F.Supp.3d 647, 653 (4th Cir. 2018). All that Tango required of Plaintiff for her employment was that she "be located in the Eastern

Region of the United States," and not any one place specifically.   (ECF No. 7–2 at 11–12.) Furthermore, and as the Fourth Circuit recognized in *Fields*, the act of hiring Plaintiff is not related to her claims, which only concerns "acts and omissions" that occurred during the course of her employment.   *Id.*   Therefore, accommodating Plaintiff's decision to work remotely is not the sort of "purposeful availment" contemplated by the personal jurisdiction jurisprudence.

Nor is Plaintiff's completion of work from West Virginia relevant to the question of jurisdiction.   The Court cannot infer that Plaintiff merely completing work in the State is akin to Tango purposefully or directly creating contacts with the State itself.   *See Callahan*, 2020 WL 2061882 at *11–12.   In fact, none of the work actually performed by Plaintiff was actually directed at West Virginia.   (ECF No. 7–2 at ¶ 14.)   Tango had no active customers in West Virginia, and Plaintiff was not actively working with or recruiting potential customers in the State. (*Id.*)   Instead, the entirety of Plaintiff's work was directed outside of the forum.   (*Id.*)

Moreover, the claims Plaintiff has asserted have similarly not arisen from any contacts Tango itself has created with the State of West Virginia.   Her claims arise out of an incident with a coworker that allegedly occurred in a hotel in Chicago, Illinois.   (ECF No. 1–1 at ¶¶ 18–19.) Further interactions with that individual continued on various work trips in Canada and Texas. (*Id.* at ¶¶ 25(a)–(d).)   Thereafter, Plaintiff was required to attend weekly video conference calls based in Texas, which Plaintiff attended remotely.   (*Id.* at ¶ 28.)   Further still, the subsequent investigation into Bishop's conduct, as well as the decision to retain him, occurred "internally in Texas."   (*See* ECF No. 1–1 at ¶ 21.)   While Plaintiff may insist that she attended calls or otherwise initiated contact from West Virginia, none of the allegations here resulted from Tango's purposeful or direct contact with the State, which falls short of the standard dictated by purposeful

availment.   *See Fields*, 376 F.Supp.3d at 653. *See also Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State."); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416–17 (1984); *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 452 (4th Cir. 2000).

The fact that the effects of Tango's decisions were felt by Plaintiff in her home state of West Virginia is similarly not enough to establish personal jurisdiction.   *See Walden*, 571 U.S. at 290.   Plaintiff relies on *Calder v. Jones*, 465 U.S. 783 (1984),[2] to argue that where the effects of a tortious injury are felt, jurisdiction is proper.   (ECF No. 8 at 10–11.)   The Supreme Court's later decision in *Walden*, however, clarified *Calder* by reinforcing the principle that the "relationship among the defendant, the forum, and the litigation," remained the primary focus of the analysis.   *Walden*, 571 U.S. at 287.   Specifically, the Supreme Court elucidated that the "ample" contacts the defendants in *Calder* had directed at California was enough to make jurisdiction proper, "based on the 'effects' of their Florida conduct in California."   *Id.* at 287 (quoting *Calder*, 465 U.S. at 789.)   Those contacts included relying on calls to California sources for the damaging article; reputational injury caused in California by the distribution of nearly 600,000 copies of the weekly newspaper; and that the "brunt" of the injury was felt in California. *Id.* at 287.   In other words, rather than their only connection to California being through the plaintiff, "the reputation-based 'effects' of the alleged libel" inextricably tied the defendants to California.   *Id.*   Based on the foregoing, it is evident that Tango's actions here were not directed

---

[2] *Calder*, a decision law students across the country undoubtedly know well, dealt with a California actress who brought a libel suit against a reporter and editor for the National Enquirer, which was headquartered in Florida.

at West Virginia, and "the plaintiff cannot be the only link between the defendant and the forum."

*Walden*, 571 U.S. at 285.

Plaintiff's final argument is that Tango's own employee handbook acknowledges that it "expected to be subjected to the employment laws of the states where its employees worked[.]" (ECF No. 8 at 4.)   That section of the handbook reads as follows:

> We are committed to workplace policies and practices that comply with federal, state and local laws. For this reason, this employee handbook/ PO policy guide may include, where applicable, State Supplements regarding certain state and local policies, rules, and practices. . . .
> The State Supplements are intended as a resource to identify specific employment law provisions that are relative to the state in which you work. . . .

(ECF No. 8–2 at 1.)   The Court is not convinced that this notation in the employee handbook satisfies the question of whether Tango purposefully availed itself to the State of West Virginia.[3] Notably, no state supplement is provided regarding West Virginia, which is certainly evidence that Tango did not have sufficient contacts there to make any West Virginia supplement "applicable." But it further seems implausible to the Court that such a broad proclamation could be used to argue that Tango could reasonably expect to be haled into any state or local jurisdiction.   If the Court were to take this to its logical conclusion, then Tango would be expected to be haled into any court in any jurisdiction based on any one's employees presence in an area.   That conclusion is surely unreasonable.   Moreover, Tango has submitted its Employment, Confidential Information and Invention Assignment Agreement and the offer of employment letter it sent to Plaintiff, arguing that both expressly state that Texas law shall apply to any dispute arising from her employment

---

[3] Tango also distinguishes some of the cases Plaintiff relies on as having involved employment contracts, which Tango asserts that Plaintiff did not have here.   (ECF No. 11 at 12.)   Tango argues that its own disclaimers prevent the Court or Plaintiff from interpreting the handbook as a contract of employment, as "[a]n employer may protect itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself."   Syl. Pt. 5, *Suter v. Harsco Corp.*, 403 S.E.2d 751 (W. Va. 1991).

and that Plaintiff shall consent to the exercise of personal jurisdiction by the courts of Texas.   (*See* ECF No. 11–1 at 8, 16.)   Regardless, Plaintiff has failed to sufficiently allege that Tango has purposefully availed itself of the State of West Virginia, such that this Court cannot exercise personal jurisdiction.

In short, the only true connection that Tango has with West Virginia is Plaintiff.   While the rise of COVID-19 and the increase of remote work may one day counsel for the revisiting of the personal jurisdiction analysis framework, the Court sees no compelling reason to inappropriately expand its limited jurisdiction now.   Therefore, for the foregoing reasons, the Court **FINDS** that it lacks personal jurisdiction over Tango Networks, Inc., **GRANTS** its motion to dismiss, and **DISMISSES** it from this action.

### D. *TriNet HR III-A, Inc.*

TriNet has moved to dismiss Plaintiff's complaint under both Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.   (ECF No. 10.)   First, TriNet argues that Plaintiff has failed to allege or establish that it has the requisite minimum contacts with the State of West Virginia.   (*Id.* at 5.)   TriNet asserts that Plaintiff has failed to allege that its contacts with West Virginia are so "continuous and systematic" that general jurisdiction could be established.   (*Id.*) Furthermore, TriNet argues that even if Plaintiff adequately alleged that TriNet was a joint employer of her with Tango, she similarly cannot establish specific jurisdiction for the same reasons asserted by Tango.   (*Id.* at 5–6, n.1.)

Relatedly, and pursuant to Rule 12(b)(6), TriNet argues that Plaintiff has failed to sufficiently allege that Plaintiff was an employee of TriNet.   (*Id.* at 7.)   Specifically, TriNet points to Plaintiff's "bald assertion" that Tango and TriNet "partnered . . . to form a co-employment

relationship. . . ."   (*Id.* at 7.)   TriNet asserts that, beyond this conclusory allegation, she has failed to plead what employer responsibilities were shared by TriNet or how TriNet determined the essential terms and conditions of her employment, such that they could be considered a "joint employer."   (*Id.* at 8.)   For those reasons, TriNet asks the Court to dismiss Plaintiff's complaint.

Plaintiff responds by arguing that TriNet "purposefully availed" itself of the State of West Virginia by providing Plaintiff with a laptop and communication allowance to assist with her internet and phone bills while she completed work from home.   (ECF No. 19 at 9.)   Again, Plaintiff relies on the decision in *Williams v. Preeminent Protective Servs.*, 81 F. Supp. 3d 265 (E.D.N.Y. 2015), calling it "highly instructive" to her own case.   (*Id.* at 8.)   Furthermore, Plaintiff again argues that being required to attend videoconferences from West Virginia with Bishop satisfies the *Calder* Effects Doctrine, as described above.   (*Id.* at 10.)   Finally, Plaintiff asserts that she has adequately plead that TriNet is a joint employer with Tango, as she specifically alleged that TriNet partnered with Tango and provided "services to pay employee wages, sponsor and administer employee benefits, process and maintain certain worksite employee records, and perform other related HR functions."   (*Id.* at 16.)

"Each defendant's contacts with the forum State must be assessed individually."   *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).   Because each defendant's contacts must be analyzed individually, there must be sufficient allegations to establish a prima facie case of personal jurisdiction over TriNet alone.   Therein lies the problem with Plaintiff's assertions. The same analysis applies as before: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims

arose out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable."   *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014).

Plaintiff argues that "TriNet, through its joint employment of Plaintiff, satisfied purposeful availment by actively recruiting Plaintiff for employment while she resided in West Virginia, providing equipment to facilitate Plaintiff's work in West Virginia, and sending communications to Plaintiff in West Virginia."   (ECF No. 19 at 9.)   However, "jurisdiction and liability are two separate inquiries."   *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000).   Joint employment is a theory of liability, not of jurisdiction, and courts have routinely rejected a "single enterprise" test for jurisdiction.   *See, e.g.*, *Keeton*, 465 U.S. at 781, n.13 ("But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary."); *E.E.OC. v. Bass Pro Outdoor World, LLC*, 884 F.Supp.2d 499, 525–26 (S.D. Tex. 2012) ("The integrated enterprise theory . . . is a liability standard . . . not a jurisdictional standard."); *Langlois v. Deja Vu, Inc.*, 984 F.Supp. 1327, 1334 (W.D. Wash. 1997) ("[ T]his Court must find that jurisdiction exists over an out-of-state Defendant before the Court labels the out-of-state Defendant an 'employer' under the FLSA."); *Heidbrink v. ThinkDirect Mktg. Group, Inc.*, 2014 WL 3585698 at *4 (M.D. Fla. 2014) ("A joint employer theory is relevant to establish liability against a defendant under the FLSA; it is not relevant to establish personal jurisdiction . . . ."); *Campanelli v. Image First Uniform Rental Service, Inc.*, 2016 WL 4729173, at * 7 (N.D. Ca. 2016) ("Even if [defendant] were liable under a 'joint employer' theory, this does not establish that a separate, non-resident corporate entity without minimum contacts can be hailed into a California court."); *E.E.O.C. v.*

*AMX Communications, Ltd.*, 2011 WL 3555831, at * 7 (D. Md. 2011) ("[A]pplication of the integrated enterprise test for jurisdictional purposes would violate due process. The Court will not apply the test to assert personal jurisdiction over the Defendants . . . ."). Based on the foregoing, it is clear that Plaintiff cannot rely on the alleged relationship between TriNet and Tango to establish personal jurisdiction over TriNet.

The Court therefore turns to the specific allegations against TriNet to determine jurisdiction. First, Plaintiff alleges that she was recruited to work for "TNT[4] by its Vice President of Global Channel Sales, Pamela Strong." (ECF No. 19–1 at ¶ 4.) Next, she also alleges that, at various times, Ms. Hurley and Mr. Bartek directed communications regarding her claims to West Virginia. (ECF No. 1–1 at ¶¶ 21–24, 27.) Plaintiff also alleges that Defendants required her to attend videoconferences with Bishop in 2020, following the outbreak of the COVID-19 pandemic. (*Id.* at ¶¶ 28–29.)

Lacking from these allegations are any specific accusations against TriNet, and a close inspection of these allegations reveals inconsistencies with Plaintiff's own attestations. First, Plaintiff asserts that she was recruited by "TNT," and specifically Ms. Pamela Strong, a Vice President of Global Channel Sales. (ECF No. 19–1 at ¶ 4.) While Plaintiff makes no distinction as to which entity Ms. Strong is Vice President of, it appears uncontroverted that Ms. Strong was a Tango employee. (*See* ECF No. 6–2 at ¶ 8.) Moreover, TriNet could not have recruited Plaintiff, as she was recruited for employment in the first half of 2019, well before TriNet allegedly entered into a relationship with Tango in early 2020. Further, Plaintiff acknowledges that Mr. Bartek and Ms. Hurley, with whom she communicated about her claims, are all employees of

---

[4] "TNT" is Plaintiff's abbreviation for Defendants Tango, Nextep, and TriNet. (*See* ECF No. 19 at 2.)

23

Tango.   (ECF No. 19–1 at ¶ 12.)   Ms. Hurley herself attested to the fact that she is an employee

of Tango, and Tango alone.   (ECF No. 7–2 at ¶ 2.)   Plaintiff is entitled to favorable inferences at

this stage, but these inconsistencies—coupled with the affidavits submitted by Defendants—leaves

the Court to conclude that Plaintiff has failed to meet her prima facie burden.

This leaves the lone allegation that TriNet supplied her with a laptop and a monthly

communication allowance.   (ECF No. 19–1 at ¶ 8.)   While Plaintiff again does not allege

anything specific against TriNet in this assertion, opting instead for "TNT," the Court finds that

simply supplying Plaintiff with means of communication is insufficient to satisfy the minimum

contacts test.

As referenced above, Plaintiff again relies on *Williams v. Preeminent Protective Servs.,*

*Inc.*, and asserts that it is a "highly instructive" decision.   The Court disagrees.   There, the Eastern

District of New York relied on the State of New York's long-arm statute to find personal

jurisdiction over a non-resident defendant.   *Williams*, 81 F.Supp.3d at 271.   Specifically, the

statute allows New York courts to exercise jurisdiction over non-residents who "transact any

business within the state, provided that the transactions are purposeful and that there is a substantial

relationship between the transactions and the claims being asserted against the non-domiciliaries."

*Id.*   The court relied on the "purposefulness" and "substantial" tests developed under this statute

and concluded that the non-resident defendant "transacted business" in New York when it hired

the plaintiff, and that they engaged in a "substantial relationship" as the result of the employment.

*Id.* at 272.   In reaching this decision, however, the court did not engage in any extensive discussion

as to how the various elements of the test were met, leaving little to be gleaned for this Court.

24

Instead, and as described more thoroughly above, even if TriNet itself directly supplied both the equipment and the allowance to Plaintiff, this contact alone falls short of purposeful availment. As has been stated by this Court and others, the plaintiff alone cannot be the sole connection to the forum. *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Therefore, and for the foregoing reasons, the Court **FINDS** that it lacks personal jurisdiction over TriNet HR III-A, Inc., **GRANTS** its motion to dismiss, and **DISMISSES** it from this action.[5]

E. *Nextep Business Solutions, Inc.*

Nextep argues that personal jurisdiction does not exist over it and thus moves this Court for dismissal of the claims against it. First, Nextep argues that specific jurisdiction does not exist because "Nextep's contacts with West Virginia did not form the basis of this suit." (ECF No. 14 at 5.) In support of this argument, Nextep asserts that the incidents that form the basis of this suit occurred in Illinois, Texas, and Canada, none of which relate to any actions or contacts in West Virginia. (*Id.* at 6.) Furthermore, Nextep asserts that the only plausible basis for jurisdiction is Plaintiff's attendance on videoconferences, but argues that this too is insufficient as Plaintiff herself called in remotely, thus initiating the contact from West Virginia. (*Id.* at 6–7.) Because those conferences were contacts that Plaintiff initiated, and not Nextep, Nextep argues that they cannot form the basis of personal jurisdiction. (*Id.* at 7.)

At the outset, the Court notes that Plaintiff has asserted the same arguments in response to Nextep as she did for TriNet, and nearly verbatim. As this Court already explained, joint employment cannot form the basis for jurisdiction, as it is instead a theory of liability. *See, e.g.,*

---

[5] In concluding that the Court lacks personal jurisdiction over Defendant TriNet, the Court declines to take up the remainder of TriNet's argument, namely that Plaintiff has failed to state a plausible claim against it.

*Keeton*, 465 U.S. at 781, n.13; *Bass Pro Outdoor World, LLC*, 884 F.Supp.2d at 525–26; *Langlois*, 984 F.Supp. at 1334; *Heidbrink v.*, 2014 WL 3585698 at *4; *Campanelli*, 2016 WL 4729173, at * 7; *AMX Communications, Ltd.*, 2011 WL 3555831, at * 7.   Based on the foregoing, it is clear that Plaintiff cannot rely on the alleged relationship between Nextep and Tango to establish personal jurisdiction over Nextep.

Again lacking from Plaintiff's complaint are specific actions undertaken by Nextap that would establish personal jurisdiction.   Of note, Nextep did not participate in the recruitment of Plaintiff for employment, nor did it provide any form of equipment or allowance for the performance of her duties.   (ECF No. 22–1, ¶¶ 3–5.)   Further, and again like TriNet, none of the individuals named in Plaintiff's complaint worked for Nextep.   Instead, all were employees of Tango.   (*See* ECF Nos. 6–2 at ¶ 8; 7–2 at ¶ 2; 19–1 at ¶ 12.)   While Plaintiff is entitled to favorable inferences at this stage, these allegations and the uncontroverted assertions in response leave the Court to conclude that Plaintiff has failed to meet her prima facie burden.

Therefore, and for the foregoing reasons, the Court **FINDS** that it lacks personal jurisdiction over Nextep Business Solutions, Inc., **GRANTS** its motion to dismiss, and **DISMISSES** it from this action.

## IV.   CONCLUSION

For the foregoing reasons the Court **FINDS** that it lacks personal jurisdiction over Defendants Tango Networks, Inc.; Nextep Business Solutions, Inc.; TriNet HR III-A, Inc.; and Michael Bishop.   The Court therefore **GRANTS** the Defendants' Motions to Dismiss (ECF Nos. 6, 9, 13), and **DISMISSES** this action.   The Clerk is further **DIRECTED** to remove this action from the Court's active docket.

26

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          December 23, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE